IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


INNOVATOR ENTERPRISES, INC.,

       Plaintiff,

    vs.

B. TODD JONES,

       Defendant.

_____

CA No. 13-581
Washington, DC
February 21, 2014
1:47 p.m.


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiff:        DAN M. PETERSON, ESQUIRE
                          Dan M. Peterson, PLLC
                          3925 Chain Bridge Road
                          Suite 403
                          Fairfax, VA 22030
                          (703) 352-7276
                          dan@danpetersonlaw.com


For the Defendant:        MARIAN L. BORUM, ESQUIRE
                          U.S. ATTORNEY'S OFFICE
                          Civil Division
                          555 Fourth Street, NW
                          Washington, DC 20530
                          (202) 252-2510
                          Marian.L.Borum@usdoj.gov


ALSO PRESENT:             MATTHEW KAHN, ESQUIRE
                          Bureau of Alcohol, Tobacco,
                            Firearms & Explosives

Court Reporter:                    Lisa M. Foradori, RPR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6706
                                   333 Constitution Avenue, NW
                                   Washington, DC  20001
                                   (202) 354-3269

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1                          P R O C E E D I N G S

2              COURTROOM DEPUTY:  Your Honor, we have Civil

3     Action 13-581.  Innovator Enterprises versus B. Todd Jones.

4              Counsel, please come forward and identify

5     yourselves for the record.

6              MR. PETERSON:  Dan Peterson for the plaintiff,

7     Innovator Enterprises.

8              MS. BORUM:  Marian Borum on behalf of the United

9     States.  Also with me will be Matthew Kahn -- he had to step

10    out for a minute, and he's from ATF.

11             THE COURT:  All right.  Thank you.  Good afternoon

12    to both of you.  We're here on a pretty straightforward motion

13    for summary judgment in this APA review case, and I think I've

14    already told you -- and if I haven't, I will tell you now --

15    30 minutes per side for presentation of arguments should be

16    very ample.  So, I'll probably keep it to that.

17             I have read the papers, so, please assume that I'm

18    familiar with the matter.  And with that, I think we'll hear

19    first from -- I guess -- is there only a Government motion or

20    cross-motions?

21             MR. PETERSON:  There are.

22             MS. BORUM:  There are cross motions, Your Honor.

23             THE COURT:  But it probably makes sense to hear

24    from the Government first in any event.

25             MS. BORUM:  Yes, Your Honor, and because of the

1   technical nature of the decision made by the ATF to classify

2   the devices as a silencer, Matthew Kahn will be handling the

3   argument on behalf of the Government with respect to the

4   classification.

5           To the extent that the Court needs to hear argument

6   about the deference to be accorded to that decision, I'd be

7   happy to address the Court.

8           THE COURT:  So, what do you want me to do now?

9           MS. BORUM:  Matthew Kahn will come in and he will

10  make the argument for Your Honor.

11          THE COURT:  All right.

12          MR. KAHN:  Good afternoon, Your Honor.

13          THE COURT:  Good afternoon, Mr. Kahn.  How are you?

14          MR. KAHN:  I am good.  I'm here on behalf of the

15  Bureau of Alcohol, Tobacco, Firearms & Explosives.  Before I

16  delve into the Government's argument today, I'd like to

17  provide the Court with a brief outline of the different

18  segments of the Government's argument, basically it could be

19  boiled down into five parts.

20          First, I want to provide the Court with some

21  context by briefly discussing the facts which lead to this

22  lawsuit.  Next, I want to delve into the core issue of the

23  this case, which concerns the definition of the term silencer

24  within the Gun Control Act and the National Firearms Act.

25  Then I want to talk about ATF applied this definition of

1   silencer to the device at issue in this case.  I'd like to

2   walk through the letter that ATF sent to plaintiff to show

3   that ATF provided a reasonable explanation of how it arrived

4   at its conclusion.

5          And the fourth part, I'd like to briefly touch on

6   some of the arguments raised by plaintiff's counsel in its

7   motion for summary judgment.  And then in the fifth part I'd

8   like to briefly discuss the arguments ATF made in its motion

9   to dismiss.  So, as I noted, I'd like to briefly provide some

10  context for the Court to consider.

11         THE COURT:  All right.  Bear in mind what I said

12  before you came in, which is 30 minutes a side for argument.

13         MR. KAHN:  Yes, sir.  Thank you.  In brief, Your

14  Honor, as the Court is probably well aware at this point,

15  plaintiff submitted its device to ATF in August 2012 along

16  with the letter describing its function.  About a month later

17  in September 2012, ATF responded with its classification

18  wherein it concluded that the device constituted a firearm

19  silencer.

20         In April 2013 plaintiff filed its complaint.

21         THE COURT:  Now, based on that review, what

22  standard would you say ATF applied?

23         MR. KAHN:  Can I just clarify the question, Your

24  Honor?  Are you discussing the standard with regard to the

25  Administrative Procedure Act or the standard applied under the

1  Gun Control Act?

2          THE COURT:  The Gun Control Act.  The definitional

3  standard of what is a firearm --

4          MR. KAHN:  Thank you, Your Honor.

5          THE COURT:  -- silencer.

6          MR. KAHN:  Yes, Your Honor.  ATF applied the

7  standard set forth in Title 18 United States Code 921(a)(24)

8  which defines the term firearm silencer.  In that

9  definition --

10          THE COURT:  That definition just says:  A device

11  for silencing the report of a firearm, basically.

12          MR. KAHN:  Correct, Your Honor.  But, importantly,

13  the definition goes on, and it's important to bear in mind the

14  language of the rest of the definition, which discusses the

15  terms combination of parts, and also, contemplates that a

16  single part can constitute a silencer under that definition.

17          THE COURT:  Okay.

18          MR. KAHN:  Pardon me, Your Honor, I'm just

19  organizing my documents because I came into the court a bit

20  late.

21          THE COURT:  It's quite all right.

22          MR. KAHN:  I'll get into the definition of silencer

23  at this point, which is the core issue of this case.  ATF's

24  position is that the term "for" in the definition connotes

25  purpose, not effectiveness.

1          THE COURT:  Where is that in the decision letter?

2     Where does the decision letter say that it's the purpose that

3     matters?

4          MR. KAHN:  That's a good question, Your Honor, and

5     it does not mention that the word "for" means purpose.  The

6     letter does cite the relevant statutory language, the entire

7     definition, which repeats the word "for" three times.  Could

8     ATF have included a parenthetical citation to  United States

9     v. Crooker, for instance, noting that the word "for" means

10    purpose?  Sure.

11         THE COURT:  You say three times.  The other two

12    uses of "for" have nothing to do with "for silencing".

13    They're talking about for use in assembling the item.

14         MR. KAHN:  That's a good point.

15         THE COURT:  They're not really for silencing, but

16    go ahead.

17         MR. KAHN:  That's a good point, Your Honor.  Can we

18    focus on that language briefly?

19         THE COURT:  That's where we need to start.

20         MR. KAHN:  Yes, sir.  The language in the

21    definition, I'd like to start -- any device for silencing,

22    muffling or diminishing the report of a firearm, including any

23    combination of parts designed or redesigned and intended for

24    use in assembling or fabricating a firearm silencer.  So, it

25    hooks back into the definition of firearm silencer.  You still

1   have to have a combination of parts for assembling or

2   fabricating a firearm silencer.  That is a device which --

3   THE COURT:  But I don't see how any of three

4   possible definitional approaches would be inconsistent with

5   the language.  A definitional approach that said purpose is

6   paramount.  A definitional approach that said looking at the

7   various component parts is the most important methodology with

8   respect to determining whether something is a firearm

9   silencer.  Or an approach that said, we'll actually test the

10  device and determine whether it actually does silence the

11  report of a firearm.

12  All three of those approaches would seem to me not

13  to be inconsistent with the statutory language.  So, why one

14  versus the other?  And I'm going to return several times this

15  afternoon to the issue of -- if you don't put it in the

16  letter, how can I rely on purpose as being the correct

17  definition that was actually applied by the agency?

18  MR. KAHN:  Great questions, Your Honor.

19  THE COURT:  There's no evidence -- is there

20  anything in the record, and I stress the record, not the

21  briefing, is there anything in the record that indicates that

22  ATF looked at purpose as being a significant measure of

23  whether something is a firearm silencer?

24  MR. KAHN:  Yes, Your Honor.

25  THE COURT:  What?

1          MR. KAHN:  The parts that ATF examined is an

2     indication of the purpose of the device as reflected in the

3     design.

4          THE COURT:  Why is that?

5          MR. KAHN:  Well, first off, I think it would be

6     helpful -- I want to answer this question -- Your Honor did

7     mention:  Why this approach over the others?  Why purpose?  I

8     think it's important to point out that throughout plaintiff's

9     arguments no case law is presented for the definition of

10    "for".  The only thing that is provided is a dictionary

11    definition, whereas, ATF has cited to case law.  So, on that

12    basis the courts have addressed this question.

13         THE COURT:  You'd have a much more persuasive

14    argument if the decision letter also cited to purpose.

15         MR. KAHN:  This is true, Your Honor, but in terms

16    of examining whether the letter satisfied the standard in the

17    APA, all it had to do was provide a rational connection

18    between the facts relied on and the conclusion.

19         So the notion that purpose had to be an announced

20    in the letter, even though that standard may have guided ATF's

21    determination --

22         THE COURT:  That's a fairly astounding proposition

23    ultimately if you carry it forward because that means that an

24    agency could say anything in the letter so long as it had a

25    good reason in its back pocket that it didn't express in the

1    decision document, it would still be a valid decision under

2    your reading of the APA.  I don't think that's the law.

3              MR. KAHN:  Your Honor, I do not intend to suggest

4    that such a sweeping proposition that agency could always keep

5    the actual reason in its back pocket.  I would only suggest

6    that if we walk through the letter, I believe that the agency

7    did articulate a reasonable explanation as to why it

8    classified devices --

9              THE COURT:  We'll get to that.  But the reasonable

10   explanation articulated did not include an assessment of

11   purpose.  There were two things that the decision letter

12   addressed.  It addressed characteristics, physical

13   characteristics, and it addressed testing.  Rejecting testing

14   as a proper assessment and relying on physical

15   characteristics, it did not even address purpose.

16             So, I don't see how under the case law dealing with

17   post hoc rationalizations, I don't see how ATF can rely on

18   purpose as being determinative here.

19             MR. KAHN:  Well, Your Honor, perhaps the case law,

20   which is, I wouldn't say settled, but there is case law out

21   there is consistent with what ATF did in terms of looking at

22   how -- at the parts of the device and trying to discern

23   through its design what the purpose is.  And the fact that ATF

24   didn't add that case law right after it announced the

25   statutory definition shouldn't be fatal to its classification.

1  ATF did cite right at the outset of the letter the statutory

2  definition --

3          THE COURT:  Absolutely.

4          MR. KAHN:  -- and had the recipient of the letter,

5  perhaps they did, perhaps they didn't, but they certainly

6  could have examined that language in light of the case law and

7  reviewed the letter, which would be consistent with examining

8  the parts to discern what the purpose of the device is.

9  So, --

10          THE COURT:  Is there any -- other than the briefs

11  in this case -- is there anything else that I can look to to

12  have -- define support for the agency's view that purpose is

13  conclusive or is important here?  Anything set out in

14  guidance, in regulations, in any documentation that the agency

15  has?  Anything that stresses:  Look, when we're dealing with

16  these things, you need to look at purpose.  So, it's

17  important, for example, what the petitioner says with respect

18  to their device.  Anything that we can look to?

19          MR. KAHN:  Your Honor, we do mention the internal

20  procedures that ATF relies on when examining devices.  It's

21  mentioned in the briefs.  We have different standard operating

22  procedures that we look at.  One particular standard operating

23  procedure discusses the examination of devices submitted to

24  ATF, specifically for classification purposes, that is, not in

25  the criminal prosecution context, just for a determination as

1  to whether a device constitutes or meets a definition under

2  the Gun Control Act or National Firearms Act.  Plaintiff does

3  point out that that particular set of procedures doesn't

4  address silencers.

5           So, we've responded with how we do examine

6  silencers when they are being submitted for classification

7  purposes and not for purposes of an examination in the context

8  of a criminal prosecution.  We have another set of procedures

9  for examining silencers when used as evidence in criminal

10  prosecutions.  And so ATF relies on that protocol, at least as

11  a guide, to determine whether a particular silencer that's

12  been submitted to the agency constitutes a silencer under

13  federal law.

14           THE COURT:  All right.  So, let's assume for the

15  moment that purpose is a significant part of the analysis.

16  How does the agency determine purpose?

17           MR. KAHN:  By examining the parts of the device,

18  the design of the device, the characteristics of the device.

19           THE COURT:  That means that my three part structure

20  isn't really a three-part structure because the

21  characteristics is really the same as the purpose.

22           MR. KAHN:  Does Your Honor mind explaining the

23  three part --

24           THE COURT:  I said there were three possible

25  approaches, one is to look at purpose, one is to look at the

1    characteristics; the other is to do actual testing.  And if

2    you're going to say that purpose is determined by looking at

3    the characteristics, then those two meld.

4              MR. KAHN:  That would be the position of the

5    agency, Your Honor.

6              THE COURT:  So, it's just the characteristics that

7    you look at to determine purpose rather than to determine

8    effectiveness or actual desired use?

9              MR. KAHN:  Correct, Your Honor.

10             THE COURT:  So, if someone were to submit an item

11   to you in which they said this is not a firearm silencer, it's

12   only a -- what's another kind of item that gets submitted for

13   the determination as to whether it's a silencer?

14             MR. KAHN:  You could have a flash suppresser.

15             THE COURT:  A flash suppresser.  So, they submit a

16   document that says -- and they'd submit the items that says,

17   this is a not a silencer; this is a flash suppresser.

18             MR. KAHN:  (Nodded affirmatively).

19             THE COURT:  And you then -- "you" meaning ATF, not

20   you personally, look at it and determine that that flash

21   suppresser -- I'm sorry -- that item, because I don't want to

22   predetermine what it is, has ported inner tubes, has end caps,

23   and has encapsulators.  Does that mean that the agency

24   determines that it is a firearm silencer?

25             MR. KAHN:  Well, to be quite frank, Your Honor,

1   this is why the agency has expertise with regard to analyzing

2   these devices.  I can't stand here in front of the Court today

3   and opine as to whether that type of device with those

4   particular features constitutes a silencer.

5           THE COURT:  But how can I glean anything from this

6   record then, because the only thing that the agency

7   determined -- the only thing that's in the decision letter is,

8   this item that the petitioner did not say was a firearm

9   silencer, indeed what it said is somewhat inconsistent with it

10  being a firearm silencer.  I know you can argue because

11  there's the suppression that may occur towards the target as

12  opposed to towards the shooter.

13          But there's nothing in what they submitted that

14  said this is a firearm silencer.  And the only thing the

15  agency did is say that it has these three out of a list of

16  six, that is not an exhaustive list, there may be eight more

17  things, who knows.  All the agency said was it has these three

18  physical characteristics, therefore, it is a firearm silencer.

19          But the hypothetical I just gave you, that same

20  determination could be made by the agency and you would say to

21  me, I assume:  Judge, relying on the agency's expertise,

22  they've decided that it has three characteristics; that's all

23  you need.

24          MR. KAHN:  Well, Your Honor, I'd like to address

25  the hypothetical you're raising because I think it's similar

1   to the hypothetical that plaintiff's counsel raised in its

2   brief.

3   THE COURT:  It's not the pink ribbons hypothetical?

4   MR. KAHN:  It's the reverse of the pink ribbon

5   hypothetical.  It's the situation where you have a device that

6   in fact silences, yet the claimed purpose is to not silence.

7   THE COURT:  I didn't say the device that I had did

8   silence; I just said it had three characteristics.

9   MR. KAHN:  That's correct, Your Honor.  I want to

10   retract what I just said.  That is a hypothetical that was

11   raised, which we are prepared to address.  But with regard to

12   the Court relying on the agency's determination that the three

13   parts indicated that this device was a silencer, the statutory

14   language contemplates that a parts based analysis will take

15   place.  It talks about a device for silencing.  A combination

16   of parts intended for a firearm silencer.  A single part for a

17   firearm silencer.

18   Congress contemplated that ATF would examine the

19   parts of the device to make its determination.

20   THE COURT:  Those parts of the definition -- let's

21   see what they really say.  They say:  Including any

22   combination of parts designed or redesigned and intended for

23   use in assembling or fabricating a firearm silencer.

24   So, let's take that language.  Did the agency

25   conclude that this was a combination of parts intended for use

1  in assembling or fabricating a firearm silencer?

2          MR. KAHN:  Your Honor, the agency did not explain

3  in the classification letter that --

4          THE COURT:  -- much of nothing, but go ahead.

5          MR. KAHN:  Well, if Your Honor might entertain the

6  agency's opportunity to walk it through the classification

7  letter, I think the Court might have a different view about

8  the method that ATF employed when examining this device,

9  because in truth at first glance it appears that the agency

10 gave short shrift to the device that was submitted by

11 plaintiff's counsel.

12          THE COURT:  All right.  We'll walk through, but

13 let's stick with the statutory language for a second.

14          MR. KAHN:  Yes, Your Honor.

15          THE COURT:  And the last part of the statutory

16 language says:  And any part intended only for use in such

17 assembly or fabrication.  That tells me that if a subset, just

18 a portion of a silencer is submitted, it still will be

19 considered a silencer, and that's not the kind of situation we

20 have here.  I don't think that's really an indication by the

21 statutory language that the proper test for determining

22 whether something is a firearm silencer, under this

23 definition, is a physical characteristics test.  I don't think

24 that leads to that conclusion, but you go ahead and walk me

25 through the decision letter.

 1          MR. KAHN:  Before I do that, Your Honor, may I cite

 2   some language in the Crooker case that may --

 3          THE COURT:  Sure.

 4          MR. KAHN:  -- be illustrative of why the parts are

 5   always relevant?

 6          THE COURT:  You didn't hear me say they're not

 7   relevant.

 8          MR. KAHN:  Correct, Your Honor.  We just want to

 9   make sure the Court understands that the ATF believes that the

10   parts are always relevant, whether it's a combination of parts

11   analysis --

12          THE COURT:  Yeah, I think ATF should believe that

13   the parts are relevant -- the physical examination is

14   relevant.  But that doesn't necessarily lead to the conclusion

15   that a test, which seems to be what ATF applied of -- if you

16   have three or more characteristics from this list of six or

17   more characteristics it, therefore, is a firearm silencer.

18          MR. KAHN:  Your Honor, may I clarify the position

19   of the agency.  The agency did not mean to suggest that if you

20   have merely three particular parts on our list of parts that

21   we compiled that that would be sufficient to constitute a

22   silencer.  In fact, Your Honor, we could have a device that

23   has the same exact characteristics, but it may or may not

24   constitute a silencer, which does raise a question about why

25   we concluded that this particular device constituted a

1  silencer.

2         THE COURT:  Show me in the letter what conclusions?

3  Walk me through it.

4         MR. KAHN:  Yes, Your Honor.  First, if Your Honor

5  will notice in the second paragraph, ATF articulates the

6  entire relevant legal standard.

7         THE COURT:  The definition.  Okay.  That's there.

8         MR. KAHN:  Second, right after announcing that

9  legal standard, ATF articulates how it applies the standard.

10  Again, the ultimate determination here is whether ATF provided

11  or articulated a reasonable explanation.

12         THE COURT:  And the explanation was that ATF looks

13  at physical characteristics.

14         MR. KAHN:  Correct.  That's the second --

15         THE COURT:  And then there's a list of six physical

16  characteristics, with an indication that there could be more.

17         MR. KAHN:  Correct, Your Honor.  That's the third

18  thing it does.  But I think it's important to go back to that

19  second thing, because there's information in the record which

20  goes to how ATF conducted its analysis.  That second thing

21  that ATF does that I just mentioned, namely, that it

22  articulates how it applies a standard.  I'd like to just read

23  that for a second.

24         THE COURT:  From where?

25         MR. KAHN:  This is in the letter, it's the -- I

 1   would say it's the second, third --

 2           THE COURT:  The paragraph beginning:   When

 3   evaluating?

 4           MR. KAHN:  Correct, Your Honor.

 5           THE COURT:  I can read it.  I don't know that you

 6   have to read it out loud.

 7           MR. KAHN:  I'd just like to focus on the latter

 8   portion of that sentence, which says:  Characteristics that

 9   are consistent with those of known firearm silencers.

10           THE COURT:  Right.

11           MR. KAHN:  Which reflects that ATF doesn't just

12   examine devices in a vacuum, it has a repository of devices

13   and classifications.

14           THE COURT:  That's how it came up with these six

15   characteristics.

16           MR. KAHN:  That's absolutely right, Your Honor.

17           THE COURT:  Or six or more, because there may be

18   more.

19           MR. KAHN:  Well, certainly, with the language, but

20   are not limited to.  It's true; they're not.  In our SOPs

21   there's a broader range of characteristics and features that

22   are contemplated.  But, again, Congress in defining silencer

23   didn't indicate what particular parts would be indicative of a

24   purpose to silence.  So, ATF compiled a list over the years,

25   and when devices are submitted it consults that list.

1          I think if we go to the portion of the

2     administrative record, which is Page 8.  It's entitled

3     Correspondence Check Sheet.  And by examining that document,

4     it reflects that what this particular examiner did in this

5     case, which kind of enhances the understanding of the method

6     that ATF employed in analyzing this device, which may not be

7     necessarily reflected by the letter, but it does show that it

8     was more than just a simple -- well, you know, it looks like a

9     silencer kind of analysis.

10          THE COURT:  This language may not be reflected in

11     the letter is a problematic acknowledge because it's the

12     letter that's the decision document that needs to articulate

13     the reasonable explanation of the agency's decision.

14          MR. KAHN:  Yes, Your Honor.  And, you know, it's a

15     standard I understand that ATF has to meet with its letter.

16     Perhaps this wasn't the most eloquently or clearly explained

17     reasoning as to why we constitute and classify the decision as

18     a silencer, but there are minimal standards.

19          The case law that we've cited makes clear that

20     these letters don't have to be models of analytic precision,

21     but they do need some minimal standard of rationality  and

22     there has to be a connection between the facts and the

23     conclusion reached.  And this is probably a close call, Your

24     Honor, but we would submit that we've met that standard.

25          THE COURT:  I'm just not sure how a physical

 1   characteristics test –– is there anything beyond physical

 2   characteristics that the agency looked at?

 3        MR. KAHN:  No, Your Honor.  That is the position of

 4   the agency.

 5        THE COURT:  So, I'm not sure that a physical

 6   characteristics test, which from the document, the decision

 7   document, appears to be if you have three, then you are a

 8   firearm silencer.  I'm not sure that that really is

 9   satisfactory.  You can think of innumerable hypotheticals of

10   physical characteristics, and I understand these aren't all

11   silencer situations, but of physical characteristics where

12   three physical characteristics would not lead one to conclude

13   that something is what you're looking for.

14        MR. KAHN:  That's precisely right, Your Honor.

15        THE COURT:  I mean, the most –– sort of, it's not

16   an off-the-wall hypothetical, but it's sort of off the subject

17   hypothetical, would be if you're looking to determine whether

18   something is an elephant, is it enough to just say that it has

19   a tail, it has four feet and is gray.

20        MR. KAHN:  Certainly not, Your Honor, because you

21   could have ––

22        THE COURT:  Because if it were, then a mouse would

23   be an elephant.

24        MR. KAHN:  Right.  However, again the agency

25   certainly –– this is not the magnum opus of the agency

1   letters, we will concede that point.  But, again, the standard

2   just --

3           THE COURT:  And then the agency does reject one

4   possible approach, which is the approach of actually testing

5   the item, and that rejection is very clear.  The reason for

6   the rejection is not nearly as clear, because all it really

7   says is that while you can use that equipment to demonstrate

8   that items do silence, i.e., diminish the report of a firearm,

9   we don't use those tests to determine classification.

10          MR. KAHN:  That's correct, Your Honor.  I'd like to

11  make a few comments on that.  The point is that the agency is

12  making an effort to clarify to the individual that submitted

13  the device what we're going to do, what we're not going to do.

14          THE COURT:  And I can't fault the agency for that.

15  I am just looking into the persuasiveness of the logic now.

16          MR. KAHN:  Correct, Your Honor.  I would say that

17  that just goes to show that the agency did make an effort to

18  try and articulate an explanation of exactly what it was

19  doing, and that perhaps can explain that language.  I would

20  point out that the word "demonstrate" is in bold.  And the

21  reason for that is to emphasize that it's only for purposes of

22  the -- that is, the equipment that we have to test the sound

23  produced by devices or sound --

24          THE COURT:  The astounding thing here -- and deal

25  with this for a moment -- we have a situation where someone

1   submits a device, as they are required to do, so that ATF can

2   determine whether it is a firearm silencer or muffler.  And

3   they submit it saying that it is not, that that's not what

4   it's for.

5           And all the agency does is take it, and say,

6   notwithstanding the fact that it's submitted and the submitter

7   says it's not for silencing.  They say, well, it has three

8   characteristics, among many, of a silencer, and therefore it

9   is.

10          MR. KAHN:  Well --

11          THE COURT:  If you think about that, that seems a

12  little scant in terms of the persuasiveness of the rationale.

13          MR. KAHN:  Well, there are few important points to

14  make about that.  First off, there is no statute or regulation

15  that required plaintiff to submit its device.  Presumably,

16  plaintiff had a question about whether or not it in fact

17  constituted a silencer, despite its professed purpose to not

18  silence.

19          THE COURT:  It didn't want to do something

20  inconsistent with the law and the regulations.

21          MR. KAHN:  That's true.  But clearly --

22          THE COURT:  As opposed to taxes or penalties or

23  anything else.

24          MR. KAHN:  But there's a question there, though,

25  because if it wasn't a silencer, there would be no reason to

1    submit it.  So, even arguably you can infer that plaintiff had

2    a question about it.

3                THE COURT:  Let's proceed on that basis that it

4    wasn't easy to determine whether it was a silencer.  I'm not

5    sure that helps ATF because that means in a difficult

6    situation all ATF did was, notwithstanding what the submitter

7    says, it's got three physical characteristics, therefore, it

8    is.

9                That seems to be a situation that would call on for

10   closer scrutiny and examination and a more persuasive

11   rationale.

12               MR. KAHN:  Well, I would point out that ATF did at

13   least explain the parts that it examined and considered in

14   reaching its conclusion that it was a silencer.  And ATF did

15   explain that plaintiffs are more than willing -- are more than

16   permitted to contact the agency if it has any questions.  We

17   provided another device, which we suggested could be used as a

18   model to reconfigure this device, which might influence our

19   evaluation should the plaintiff's device be resubmitted.

20               And, yes, perhaps --

21               THE COURT:  That seems to me to be a little bit of

22   an odd situation -- correct me if I'm wrong.  But, basically,

23   that sounds like:  All right, someone has patented, in all

24   likelihood, a device that ATF has agreed is not a silencer.

25   Someone else submits a device to ATF to determine if it's a

1   silencer, and ATF's response is:  Oh, go model yours after

2   this other patented device and maybe you'll be all right.  I

3   mean, to me, that's not much of a response at all.

4          MR. KAHN:  Your Honor, again, I will concede that

5   this was not the most comprehensive explanation.  Could it

6   have certainly included more mechanical explanation as to why

7   these particular parts indicated that the purpose of the

8   device was to silence?  Yes.  But those were the main facts on

9   which ATF relied to base its determination.

10          THE COURT:  So, why doesn't the agency use

11   equipment to actually test what the device does?

12          MR. KAHN:  That's a good question, Your Honor.  The

13   simple reason is that we don't think it's legally relevant

14   because the way you determine whether a device constitutes a

15   silencer is by examining its parts to discern the purpose of

16   the device.  So, to do that you wouldn't need to test the

17   effectiveness of the device.  But as to why then does ATF have

18   this equipment in the first place, and why do some of its

19   procedures call for use of that equipment.  It's not because

20   it's legally required; it's more for purposes of criminal

21   prosecution.

22          THE COURT:  I understand why it would be useful in

23   that context.  But your position is that what is determinative

24   here is purpose.  What you're melding together now, which I

25   don't think was really done in the briefs, I think purpose was

1    sort of identified as a distinct approach from the physical

2    characteristics.  But your argument here is that it's

3    incumbent upon the agency to determine purpose, and then it

4    does so by looking at physical characteristics.  And if that

5    convinces the agency that the purpose of this, notwithstanding

6    what the inventor, submitter or whomever may say, if it

7    convinces the agency that the purpose is to silence, then

8    that's it.  Here, is it ATF's position that that was the only

9    purpose of this device --

10                MR. KAHN:  Your Honor --

11                THE COURT:  -- as a firearms silencer?

12                MR. KAHN:  Your Honor, I'm not prepared to answer

13   that question because I haven't asked that question to the

14   examiners, but they certainly concluded that it was a purpose

15   of a device at a minimum.

16                THE COURT:  And --

17                MR. KAHN:  And possibly the purpose.

18                THE COURT:  And let's assume for a moment that the

19   submitter is correct, because I don't think ATF has taken

20   issue with this, that the design, the intent -- I won't use

21   the word purpose -- was to have a muzzle break that reduced

22   the recoil, and that in addition to reducing the recoil it

23   would reduce the flash and the muzzle rise, as we all know

24   from firearms happens, but that it would not overall reduce

25   the noise, but also wouldn't increase the noise.  But it would

27

1   change the direction of the noise somewhat to direct it more

2   outward and less inward.

3              MR. KAHN:  Uh-huh.

4              THE COURT:  If all that is true and the ATF hasn't

5   taken issue with that, why would it be a silencer?

6              MR. KAHN:  Well, to some extent the agency did

7   argue in its motion to dismiss that plaintiff has effectively

8   conceded that the purpose of its device is to diminish the

9   report of a firearm.  Plaintiff concedes that, in the

10  complaint, that its device decreases the report of the firearm

11  from the shooter's point of view.

12             THE COURT:  Right.  And increases it from, let's

13  say, the target's point of view.

14             MR. KAHN:  There is a question there about the

15  increase, because let's say --

16             THE COURT:  Well, it may be a question, but ATF

17  didn't explore that question.

18             MR. KAHN:  That's why it's kind of a different

19  argument in the motion to dismiss.  That wasn't the basis upon

20  which the agency concluded that the device was a silencer.

21  The basis upon which the agency concluded the device was a

22  silencer was by analyzing the parts and discerning a purpose

23  to reduce the report of the firearm.

24             THE COURT:  Let's not overstate it.  By analyzing

25  the parts and determining that it had three parts off this

1  list and stopping there.  Because that's what it used to just

2  say, okay, that means that the purpose is that it's a firearm

3  silencer.  There was no rationalization provided for why --

4  and I think this is important -- no rationalization provided

5  for why having these three parts means it's a silencer.  It's

6  just that's what the agency has determined.

7  So there's nothing that I can look at, is there, in

8  the decision document that provides me an explanation from the

9  agency for why having three characteristics off this list of

10  six or more physical characteristics means that it's a

11  silencer?  I just have to accept the agency's implicit view

12  that that's enough.

13  MR. KAHN:  Well, for one thing, Your Honor, I agree

14  there isn't a lot of explanation in that regard, but ATF does

15  mention in the letter that these parts are consistent with

16  known firearm silencers, and that's the standard that ATF

17  explains it's applying.  That it's going to look at the device

18  characteristics in light of known firearm silencers.

19  THE COURT:  There's no explanation given for why

20  three is a magic number in this instance, and why two might

21  not be -- have been sufficient, or why four might not really

22  be necessary.

23  MR. KAHN:  Correct.  And that's because there is no

24  magic number here.  You could have these three parts in

25  another device which might not constitute a silencer, and

1   again, there perhaps wasn't sufficient explanation as to why

2   these three particular parts in this device made it meet the

3   definition of silencer.

4          But, again, the basic facts are relied on that

5   these three particular parts are consistent, are

6   characteristics of known firearm silencers, that's provided.

7   And, again, there's case law that says that these letters

8   don't have to be models of analytic precision.  Certainly,

9   plaintiff could have consulted with ATF to request more

10  explanation.

11         THE COURT:  But, ultimately, the agency's position

12  is that under this statutory definition, what ATF has to do is

13  determine the purpose of the device and that the purpose of

14  the device is determined solely by looking at physical

15  characteristics.

16         MR. KAHN:  Legally that's the position of the

17  agency.

18         THE COURT:  All right.  If I disagree, what should

19  I do?

20         MR. KAHN:  It's not over yet, Your Honor, because

21  if -- if, in other words, Your Honor, you conclude that the

22  word "for" means that ATF had to test the device to determine

23  its effectiveness, plaintiff already concedes that its device

24  diminishes the report of the firearm from the shooter's

25  perspective.  So, it's a request of what does diminish mean as

1  a matter of law.

2          THE COURT:  Does ATF have a position on that?  Is

3  that something that really is in the record before me?  Has

4  ATF taken the position that a device that does not reduce --

5  let's say this is the determination that ATF would make on the

6  basis of the test that they want to apply, the purpose test,

7  purpose looking only at physical characteristics.  Has ATF

8  determined that a device that has a purpose of not overall

9  reducing the noise, but only reducing it from the shooters

10  perspective while increasing it from the targets perspective

11  would be a silencer?

12          MR. KAHN:  I can't say that we have previously

13  classified such a device.

14          THE COURT:  That's what I thought.  So, I don't

15  think you should be arguing that that is a silencer.

16          MR. KAHN:  Well, it's kind of the argument we made

17  in our motion to dismiss, Your Honor.   That plaintiff

18  concedes that the device diminishes the report of the firearm.

19  And it really boils down to a question of what does "diminish"

20  mean.  And, certainly, that's a rational interpretation of

21  what diminish means.  That it diminishes from the perspective

22  of the shooter.  In fact, that is the very purpose for which

23  plaintiff patented this device.

24          If you read the language in its letter to ATF, it

25  clearly explains that the purpose of this device is to --

1    without using the word "purpose," but it explains that this

2    device was created to offset the disadvantages with the

3    traditional muzzle breaks which substantially tend to increase

4    the noise.  It's interesting, Your Honor, in that letter

5    submitted to ATF, the way that plaintiff describes the

6    device --

7              THE COURT:  But wait a minute, wait a minute.

8              MR. KAHN:  Yes, sir.

9              THE COURT:  There's a huge difference between a

10   device that diminishes the noise that a firearm without any

11   device on it emits and a device that doesn't increase the

12   noise.  They're saying that this device is intended to avoid

13   the problem of a muzzle break because it increases the noise.

14   They're not saying that they're trying to decrease the noise

15   that an undeviced, if you will, firearm emits.

16             MR. KAHN:  Well, Your Honor, the ATF would probably

17   challenge that by noting that the description of the device in

18   its letter to ATF is inconsistent with its allegations in the

19   complaint.  In the letter submitted to ATF, plaintiff does

20   point out that the device does not increase the noise from the

21   perspective of the shooter.  And then you see a turnaround.

22   You see a shift in the language in the complaint where

23   plaintiff for the first time concedes, well, actually, the

24   device decreases the sound from the perspective of the

25   shooter.

1          THE COURT:  Now we seem to be focusing on what the

2    submitter says, and I don't think that's where you want to be,

3    because I'm not sure that I can find ATF's decision rational

4    based on what the submitter said here.

5          MR. KAHN:  That's a good point, Your Honor.  ATF

6    doesn't mean to suggest that you -- what the submitter says is

7    determinative.

8          THE COURT:  All right.  We've used -- and I used

9    the term "we" intentionally because I've taken some of the

10   time, but we've used more than the allotted 30 minutes.  Is

11   there anything you want to finish with?

12         MR. KAHN:  May I quickly review my notes?

13         THE COURT:  Certainly.

14         MR. KAHN:  Thank you, Your Honor.  I'd just like to

15   touch on a few more things.

16         THE COURT:  In a minute.

17         MR. KAHN:  Yes, Your Honor.  One argument that

18   plaintiff makes is that ATF didn't follow its own procedures

19   because its evidentiary examination of silencers protocol

20   requires function testing.  We would submit, no, it does not.

21   And in the instances that it does require it, it's not always,

22   but sometimes it's not because it's legally relevant, it's

23   only for purposes of criminal prosecutions.

24         The other thing we'd quickly point out is this case

25   is distinguishable from Tripoli Rocketry.  There ATF

1    determined that a particular substance constituted an

2    explosive, the problem is ATF failed to consider relevant

3    numeric data with regard to burn rates of the substance at

4    issue.

5              Here there is no relevant numeric data such as

6    decibel reduction which could be determined by a testing of

7    the silencer that ATF needed to gather.  Because, ATF submits,

8    that only the purpose is determinative as reflected by the

9    parts in the silencer.

10             Thank you, Your Honor.

11             THE COURT:  Okay.  Mr. Peterson.

12             MR. PETERSON:  Thank you, Your Honor.  It has

13   become apparent to me listening to this that you understand

14   the case very well in terms of the record and that sort of

15   thing.  So, I'd like to kind of address some of the points

16   from our perspective that were raised with counsel for the

17   agency because I think they go to important parts of the case.

18             I'd like to just start with the statutory

19   definition again, and there was some discussion about whether

20   the combination of parts, designed or redesigned, or intended

21   for use in assembling or fabricating a firearm silencer

22   would -- you know, that qualifies under the definition

23   according to 921(a)(24), but to me that kind of takes it full

24   circle because you have to be assembling a silencer.  So, that

25   brings you back to the original definition.

1          And then the final clause there:  And any part

2     intended only for use in such assembly or fabrication.  There

3     hasn't been shown, I don't think in this case, that any of

4     these parts that were part of the stabilizer break were only

5     for use in a silencer.  In other words, a tube could be used

6     for any number of attachments that may be at the end of a

7     barrel on a firearm.

8          THE COURT:  So, what do you think ATF has to do

9     when you submit, as you did here, a device for them to

10    determine whether it's a firearm silencer?  Do you think

11    they're required to do the testing with their sound metering

12    equipment?

13         MR. PETERSON:  I do.

14         THE COURT:  What requires that?

15         MR. PETERSON:  What requires it is -- well, first

16    of all, I'd just like to mention something about those two

17    exhibits that they attached that relate to evidentiary and

18    non-evidentiary procedures.  Neither one of those is a public

19    document, so far as I can tell.

20         The first time we ever saw them was when they were

21    attached as exhibits to the brief in this case.  And I went to

22    the ATF website and searched diligently -- as diligently as I

23    could -- and could not find copies of those.  So, those are

24    internal procedures.  They're not anything like public

25    guidance or certainly nothing like a rule or a regulation

1   which is put out there for informing the public as to how they

2   go about these determinations.  But I will say that I do think

3   that it's required based upon their own word.

4            In their brief they say, and it's in Footnote 8, I

5   believe, of their original brief, that there are these two

6   manuals out there or two standard operating procedures, and

7   that the SOP for non-evidentiary classification, which they

8   attach as Exhibit 1, doesn't address the issue of silencers.

9            And while I'm on the subject of Exhibit 1, I will

10  say that it only talks about firearms, and meaning firearms in

11  the conventional sense, I mean, real guns.  But it does

12  require testing.  It's on Page, I believe 19 out of 27, if my

13  memory serves me well.  So, even the non-evidentiary

14  classification manual that they use for firearms requires

15  actual function testing of the firearm.  This is just --

16            THE COURT:  -- to determine whether it's a firearm?

17            MR. PETERSON:  To determine -- there's several

18  things that they determine, some of which are whether it's a

19  fully automatic weapon, some of which are importability

20  standards under the statutes that govern that.  But it does

21  clearly require function testing as part of the examination.

22            So, turning to Exhibit --

23            THE COURT:  Can you win if I don't conclude that

24  testing is required?

25            MR. PETERSON:  I think so.  I hope so.  And the way

1    I think in which we might be able to win, and I think we

2    should be able to win, is based upon some points that Your

3    Honor was bringing out in the previous discussion, which is

4    that this entire letter that they have sent out is totally

5    lacking in any connection between what they have found and

6    what they have determined.  I mean, there's just no rational

7    connection.  It's the old motor vehicle manufacturer's test

8    about -- an agency has to articulate a rational connection

9    between the facts found and the choices made.  And here I

10   don't think they've done that.  Clearly, they have relied to

11   some extent on physical characteristics --

12            THE COURT:  What if they had said, in our

13   expertise -- I don't want to write their decision letter for

14   them -- but, in our expertise, we've determined that these

15   12 items are typical of firearm silencers, and they had

16   12 items listed.  And then they said:  Examining the

17   submission here, we find that 11 of those 12 items are present

18   in this device.  On the basis of that physical examination and

19   assessment, we conclude that this is, therefore, a firearm

20   silencer.

21            Wouldn't that be good enough?

22            MR. PETERSON:  First of all, they haven't done

23   that, obviously.

24            THE COURT:  Absolutely.  But wouldn't that be good

25   enough?

1          MR. PETERSON:  Well, it certainly would be close.

2   I think they would have to identify why those

3   characteristics -- one of two things, perhaps.  Why those

4   characteristics serve to perform the function of silencing or

5   muffling or diminishing the report.

6          THE COURT:  Do you really think they are obliged in

7   every instance to give a full explanation like that of exactly

8   why the test that they're applying is, in their expertise and

9   experience, the appropriate way to examine this?

10         MR. PETERSON:  Well, that leaves me to my second

11   point.  I was going to say there are one of two ways.  The

12   other one would be if it's really more or less identical to

13   known silencers out there.  I mean, where you can say,

14   measuring this -- you know, they are so long; the tube is such

15   and such a diameter; they've got these wipes that go down the

16   middle.

17         And like you say, there are many, many

18   characteristics.  I mean, there are commercial silencers that

19   are sold out there; you can buy them and they are not

20   completely illegal.  And I understand also that there is some

21   crude homemade devices, which might be silencers.  But they

22   claim to have a data bank of some type of reference materials,

23   apparently written reference materials, as well as samples

24   that they have accumulated over the years as to what they

25   think are silencers.

1            And, you know, if they could sort of build the case

2    to say either with these features that we have found, here is

3    why it would silence a gun or reduce or diminish the report.

4    Or it's virtually identical to XYZ brand of silencer which is

5    commercially sold and which we've seen a million times,

6    then --

7            THE COURT:  So, what if there is a device at issue

8    that the submitter had developed in order to have it be a

9    muzzle break, but that it also did in fact silence the report

10   of a firearm.  That would be a firearm silencer under the

11   statutory definition, would it not?

12           MR. PETERSON:  If it were factually established,

13   for instance, by testing that it did in fact silence the

14   report of the gun, then, yeah, I think it would be a silencer.

15           THE COURT:  Through whatever method was acceptable,

16   it was factually established.  So, if your device did in fact

17   reduce the report of the firearm, then it probably would be a

18   firearm silencer?

19           MR. PETERSON:  Well, I guess there probably has to

20   be some sort of threshold test.

21           THE COURT:  There might be a de minimis test.

22           MR. PETERSON:  Right, a de minimis test.  And in

23   point of fact, we mentioned in our brief, and I don't really

24   think it's frivolous here, there are lots of devices that

25   attach to the ends of the firearms or where the barrel is

1    modified, and there was that famous picture of about a year

2    ago when the gun control debate was raging so hot of President

3    Obama out at Camp David firing an over/under shotgun.  It's

4    what they call, if you're familiar at all with shotguns,

5    called magna-porting or a similar type of method where they

6    are actual ports made in the barrel and it redirects the gas

7    upwards.

8           And the major purpose of that is to reduce that

9    muzzle rise, as Your Honor said.  But by redirecting gases up,

10   it almost certainly redirects some measure of the report.  I

11   don't know if it decreases it overall or not, but it certainly

12   redirects it.  And I would be surprised if there are not some

13   muzzle breaks out there in similar devices that have a

14   de minimis or very small or incidental effect in causing some

15   slight decrease in the overall report.  That can be caused by

16   a lot of things, a lighter load -- shooting a lighter load

17   causes a diminished report, so would a longer barrel.

18          So, you know, you have to kind of get over a

19   certain threshold, and I can't tell Your Honor what that is.

20   But here the purpose of the device was clearly not to act as a

21   silencer, and I don't think they've established by physical

22   characteristics -- Your Honor mentioned that three out of six

23   is apparently their test.  If you go back to their brief, they

24   actually argue two out of nine would be sufficient without

25   saying necessarily how they would make that determination, how

1   they would connect up the dots.

2           THE COURT:  I take it that their assessment

3   ultimately is, leave it to us because we have the expertise.

4   We know what the physical characteristics of a silencer are.

5   And if we say in one instance that these three out of a list

6   of six are present and that means it's a silencer, you should

7   defer to that.  If we say in another instance that these two

8   were present from a list of eight, you should defer to that as

9   well.

10          MR. PETERSON:  They're saying that but they

11  certainly have not really articulated the basis for that.  And

12  I think they have to have some type of a standard.  I mean, in

13  fact, they do have to have somewhat more of a standard than is

14  in this letter.  We found when the briefing was submitted in

15  this case that they do have these two standard operating

16  procedures.

17          The one for evidentiary examination of silencers

18  includes both physical characteristics as well as function

19  testing.  And I think it's quite clear, and it's laid out in

20  our reply brief, I'm not going to quote all the sections to

21  you, but they try to argue that function testing is not

22  mandatory, but point to some "may" language.  But if you look

23  at the language that we've quoted in our brief, and I can

24  probably find it here, it's Paragraphs 4.3 and following 5.0,

25  5.1 and following, and then I think it even goes up into 6.0.

1   -- yeah, 6.0.  For a silencer received without a firearm, and

2   I'm quoting here from Exhibit 2, Page 9 of 17.  In all

3   instances, the FEO should attempt to test fire the evidence as

4   received.  That's one in addition to some earlier quotes.

5           THE COURT:  So, do you agree that what they have

6   done here is, as Mr. Kahn has explained it, is look at the

7   purpose of the device and determine that purpose by examining

8   the physical characteristics, as opposed to two separate

9   tests?

10          MR. PETERSON:  Well, they certainly argued --

11          THE COURT:  One characteristics test and another

12  one, purpose test.

13          MR. PETERSON:  Well, they certainly argued purpose

14  in a very different way in their briefs and they're arguing it

15  here this afternoon.  And, as I understand it, it was really a

16  very subjective test, and it was based upon language in --

17  principally in the complaint rather than the submission, that

18  we have, quote, admitted that one of the purposes of the

19  device is to diminish sound because we've said that it

20  redirects some of it away from the shooter and in other

21  directions.  And in their chain of reasoning, that constituted

22  a purpose of diminishing the report.

23          I don't think that that's true at all.  If Congress

24  had meant to include redirection of sound, they could have

25  said that.  They used several different present participles,

1  if you will, to describe what a silencer has to do and

2  redirection of sound is not one of them.  And, in fact, in our

3  complaint my predecessor was very careful to include an

4  allegation that says that it does not reduce the total amount

5  of the sound, and there was nothing that was submitted, I

6  don't think, to the agency that indicated that there was an

7  overall reduction in the noise level.

8          THE COURT:  If they are guilty of recrafting the

9  test, in other words, what the agency did here, should I

10 accept that or is that not acceptable?

11         MR. PETERSON:  Should you accept --

12         THE COURT:  In other words, the letter only speaks

13 really to the physical characteristics.

14         MR. PETERSON:  Right.

15         THE COURT:  In their briefs they focus on purpose,

16 independent to some extent of those physical characteristics.

17 Now they are saying purpose but determined by the physical

18 characteristics.  Are either of the latter two, purpose

19 independent or purpose determined by physical characteristics,

20 positions that I should accept or are those litigating

21 positions that are not entitled to any deference and should

22 not be accepted by the Court?

23         MR. PETERSON:  I was just going to bring up that

24 exact phrase.  I mean, I think it is a litigating position.

25 It's a classic post hoc rationalization of counsel, especially

1    that the pure purpose test, if you will, that doesn't show up

2    anyplace and has no connection whatsoever with what the

3    firearms technology branch actually did in the letter.

4         Now, you say if you combine the two can you get

5    from physical characteristics to purpose?  I would go back, I

6    think, and say that the real test here has to be the statutory

7    test, and the statutory test implies some actual reduction in

8    sound, and some actual muffling or purpose alone won't do it,

9    so to speak.

10        I mean, if I went to the Home Depot and bought a

11   box that said that this was a lawn mower, you know, for

12   cutting grass.  I brought it home and found some completely

13   irrelevant device in there, I mean, the fact that it was

14   marketed or --

15        THE COURT:  That's not what we have here.  Let's

16   have a closer hypothetical, and say -- first of all, let's

17   simplify the statutory language and say that it's just any

18   device for silencing the report of a firearm.

19        MR. PETERSON:  Okay.

20        THE COURT:  Think of it simply.  And why doesn't

21   that look for a determination of purpose?  In other words,

22   even if it doesn't do it very well, if it's a device that is

23   intended to silence the report of a reportable firearm, why

24   isn't it under the statutory definition a firearm silencer?

25        MR. PETERSON:  Well, if it's a purely subjective

1   test, then you get off into ridiculous hypotheticals or could,

2   and I don't want to go there at this point.  I think maybe the

3   question is:  Does it have any real ability to do that?  I,

4   mean is it designed in such a way that it really would

5   diminish, at least to some extent, the report of a firearm.

6   And I'm not trying to claim here that a silencer has to be a

7   hundred percent effective or the best silencer in the world or

8   anything of that nature, it might be a fairly crummy silencer.

9          But I think you have to kind of couple both purpose

10  with effect, and we've cited some definitions where the word

11  "for," which is used in this statute, clearly relates to

12  actually accomplishing or achieving or making more likely the

13  intended result or the effect, and it's not just a purely

14  subjective type of purpose.

15          THE COURT:  All right.  Go ahead.

16          MR. PETERSON:  So, I think maybe we've covered to a

17  large extent the features issue and whether three out of six

18  or two out of nine, what at least our position has to be

19  shown.

20          THE COURT:  You wouldn't say purpose is irrelevant,

21  would you?

22          MR. PETERSON:  Pardon me.

23          THE COURT:  You wouldn't say purpose is irrelevant,

24  would you?

25          MR. PETERSON:  I wouldn't say it's irrelevant, no.

1  I wouldn't say that.  I would say that, you know, a real

2  silencer screws on the end of the barrel of a gun.  And so I

3  don't think that a pillow is a silencer, as they have

4  expounded upon it in their brief.  A pillow is to lay your

5  head on, not to silence a gun.

6        So, I don't think it's entirely irrelevant, but I

7  think whether or not it's actually adapted to achieving the

8  purpose of silencing the gun and actually does so to some

9  significant important degree is a relevant factor.  And in

10  point of fact, I mean, they basically have said that they are

11  not going to look at that.

12        Clearly, APA cases say that it's arbitrary and

13  capricious if the agency has failed to, quote, examine the

14  relevant data.  And purpose could be relevant, but I think

15  that function has to be relevant also, and in fact, ATF thinks

16  it's relevant.  They put it in their own manuals.  They put it

17  in the non-evidentiary manual and they put it in the

18  evidentiary manual, that in each case function testing has to

19  occur.  So, they think that it's a relevant issue.

20        I can't imagine a firearms enforcement officer

21  going into court in a criminal case and being asked, you know,

22  if this is a silencer, and saying, yes, and saying, you know:

23  Did you have the ability to test it?  Yes, we did.  Does it

24  actually silence, to some degree, a firearm?  I don't know.

25  Did you test it?  No.  I mean, I just don't think that would

 1   typically hold up in a criminal case where the standards might

 2   be a little higher, I understand.  But, still, they do have

 3   that ability and they haven't done it here, and I think that's

 4   that a very relevant factor as well.

 5           So -- pardon me.

 6           THE COURT:  Go ahead.

 7           MR. PETERSON:  So, I think the redirection argument

 8   is not anything that has any statutory basis.  We have not

 9   made any admissions along those lines.  I think their

10   exclusive purpose argument actually depends upon the

11   redirection argument.  And so while it may have some

12   relevance, I think that ATF has more or less agreed by its own

13   standard operating procedures that for both evidentiary and

14   non-evidentiary purposes, testing is important and probably in

15   most cases it's going to be dispositive, is my guess, unless

16   it's an actual copy of a known existing firearm silencer.

17           And, I mean, that's basically -- let me see if

18   there are other points that were brought out here.

19           THE COURT:  Let me ask you one question then --

20           MR. PETERSON:  Sure.

21           THE COURT:  -- if there's nothing else, that's

22   fine.  If I agree with you, basically on the level that they

23   didn't perform the right -- use the right methodology or

24   didn't clearly express what they did, why would you be

25   entitled to a declaratory judgment that this device is not a

1   firearm silencer?  Isn't that up to the agency to determine?

2   The Court doesn't usually step in and actually make that

3   determination.

4              MR. PETERSON:  Well, I guess when you're crafting a

5   complaint, you know, oftentimes attorneys will ask you --

6              THE COURT:  I'll let you run by that, but just

7   answer the question.  Do you actually think you're entitled to

8   a declaratory judgment?

9              MR. PETERSON:  I think it would be hard on this

10  record and, I mean, to be quite candid and frank with the

11  Court.  And so I think probably the appropriate remedy is a

12  remand to the agency.  Hopefully with some direction, either

13  from the body of the opinion itself if the Court were to

14  decide it that way, or at the end of the opinion as to the

15  types of explanation of the rational connection between the

16  facts found and the decision arrived at would be appropriate.

17  And I think that that could probably come out in an opinion.

18             THE COURT:  All right.  Thank you, Mr. Peterson.

19             MR. PETERSON:  Thank you.

20             THE COURT:  Mr. Kahn, very briefly.

21             MR. KAHN:  We're done, Your Honor.

22             THE COURT:  All right.  I have one question for

23  you.  One more hypothetical.  I mean, I am concerned a little

24  bit with this redirection of sound argument.  And one

25  hypothetical that has been posed is the question of whether a

1  bullhorn, the purpose of which is to redirect sound away from

2  the speaker to an audience.  Is that a device for diminishing

3  the sound produced by the speaker?

4          MR. KAHN:  I just want to make sure I understand

5  the question, Your Honor.  A bullhorn, meaning a device that

6  when you --

7          THE COURT:  You hold up to yourself and it takes

8  what you say and redirects that noise, so there's less noise

9  there, actually, and takes it out and extends it out and

10 magnifies it to the audience.  Is that a device -- because the

11 end result is less sound at the origin, much more sound at the

12 receiving point.  Is that a device for diminishing sound?

13         MR. KAHN:  Well, hypothetically, if you had someone

14 next to the person that spoke into the bullhorn, right, and

15 they said a word without the bullhorn and they heard it one

16 way, and then they heard the same word spoken into the

17 bullhorn, and because of the way the bullhorn functions, the

18 way that that bystander heard the device was diminished -- the

19 sound produced was less.  Then, yes, the bullhorn --

20         THE COURT:  With all due respect, Mr. Kahn, I think

21 you would have been better to say, no, a bullhorn is not a

22 device for diminishing sound, but thank you very much.

23         MR. KAHN:  Thank you, Your Honor.

24         THE COURT:  All right.  The case is submitted and

25 you'll be getting something some time in the relatively near

1   future, but I wouldn't expect it in the next couple of days.

2   Thank you very much.

3             MR. PETERSON:  Thank you.

4             MS. BORUM:  Thank you, Your Honor.

5   END OF PROCEEDINGS AT 3:04 P.M.

6

7

8                 C E R T I F I C A T E

9             I, Lisa M. Foradori, RPR, FCRR, certify that

10  the foregoing is a correct transcript from the record of

11  proceedings in the above-titled matter.

12

13

14

15  Date:_____            _____

16                                   Lisa M. Foradori, RPR, FCRR

17

18

19

20

21

22

23

24

25